Filed 6/29/15  P. v. Dawson CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LEVELL DAWSON,<br><br>    Defendant and Appellant. | B253047<br><br>(Los Angeles County<br>Super. Ct. No. BA382515)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br><br>**[No Change in Judgment]** |

THE COURT:

It is ordered that the opinion filed herein on June 3, 2015, be modified as follows:

Page 18:  At the end of the second full paragraph (at the end of the discussion of Issue No. III), add the following sentence:

> For the same reason, we reject defendant's claim, belatedly raised in his reply brief, that law enforcement's failure to obtain contact information for the homeless person in his car during the chase was another violation of his federal due process rights under *Trombetta* and *Youngblood*.

This modification does not effect a change in judgment.

The Petition for Rehearing is denied.

Filed 6/3/15  P. v. Dawson CA2/2 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>LEVELL DAWSON,<br><br>　　　Defendant and Appellant. | B253047<br><br>(Los Angeles County<br>Super. Ct. No. BA382515) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Frederick N. Wapner, Judge.  Modified and affirmed with directions.

John J. Uribe, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Levell Dawson of driving under the influence of alcohol (Veh. Code, § 23152, subd. (a))[1] (count 1); two counts of evading an officer with willful disregard (§ 2800.2, subd. (a)) (counts 2, 5); driving when privilege suspended or revoked (§ 14601.2, subd. (a)) (count 3); and possession for sale of cocaine base (Health & Saf. Code, § 11351.5) (count 4). In count 1, the jury found defendant willfully refused a peace officer's request to submit to, and willfully failed to complete, a chemical test pursuant to section 23612. In counts 4 and 5, the jury found, and defendant admitted, that at the time he committed the offenses, he was on bail or on his own recognizance. Defendant admitted having suffered a prior conviction for driving under the influence and four prior prison terms.

In count 4, the trial court sentenced defendant to the high term of five years for possession for sale, three years for the prior conviction, and two years for the out-on-bail allegation, for a total sentence of 10 years in that count. The trial court imposed consecutive sentences of one-third the midterm of two years (eight months) in each of counts 1, 2, and 5. The court imposed a consecutive term of six months in county jail in count 3. The court imposed three consecutive years for three of defendant's enhancements for prior prison terms. Defendant's total sentence is 15 years and six months.

Defendant appeals on the grounds that: (1) the trial court failed to instruct on a lesser included offense in counts 2 and 5; (2) the trial court abused its discretion in denying defendant's oral new trial motion; (3) the state destroyed potentially exculpatory evidence in violation of defendant's due process right; (4) the trial court violated Penal Code section 654 by imposing separate punishment in counts 1 through 3; and (5) defendant is entitled to additional conduct credits.

---

[1] All further references to statutes are to the Vehicle Code unless stated otherwise.

**FACTS**

**Prosecution Evidence**

*March 25, 2011 Incident (Counts 1 Through 3)*

On March 25, 2011, at approximately 8:15 p.m., Officers Jonathan Miller and Javier Hernandez of the Los Angeles Police Department (LAPD) were on patrol in the Wilshire district of Los Angeles when they saw a black GMC Yukon being driven without its lights on. Officer Hernandez began to follow the Yukon. The officers observed the Yukon's driver, later identified as defendant, commit numerous traffic violations, and they formed the opinion he might be driving under the influence. The officers activated the patrol car's sirens and lights, and defendant accelerated. It was a residential area, and there were some people and other cars on the streets. Defendant drove into oncoming traffic lanes to run through a red light.

After driving through several stop signs, defendant eventually stopped his car and was told to get out of his vehicle. Officer Miller estimated that the pursuit lasted approximately five to 10 minutes. Officer Miller observed that defendant had an unsteady gait, bloodshot and watery eyes, and slightly slurred speech. Officer Hernandez saw that defendant's face was flushed. Both officers could smell the odor of alcohol emanating from defendant. When asked if he had been drinking, defendant said he had drunk two beers.

Officer Hernandez had defendant perform field sobriety tests (FST's). Based on defendant's performance, his objective physical symptoms, and his conduct while driving, Officers Miller and Hernandez believed defendant was under the influence of alcohol and unable to safely operate a motor vehicle.

At the police station, Officer Miller attempted to have defendant undergo a breath test with an ECIR machine to determine his blood-alcohol level. Officer Miller demonstrated for defendant how to blow into the machine. Defendant did not blow into the machine long enough for the machine to produce a proper reading. Officer Miller reinstructed defendant and demonstrated how to take a large breath and blow it out until the machine beeps, indicating that there is a reading. Officer Hernandez noticed that

3

defendant did not wrap his lips around the tube as instructed and opened his mouth to allow air out. Officers Miller and Hernandez believed defendant was trying to not blow into the machine. Out of approximately seven attempts, only one reading was obtained, which stated that defendant's level was 0.07.[2] Two samples are required to complete the test. The officers consulted a supervisor from a traffic division who oversaw the instructions and defendant's actions. The traffic sergeant advised the officers that defendant was refusing to blow into the machine. Defendant was informed that if he did not blow properly into the machine it would be labeled a refusal, and he was given the standard admonition regarding the consequences of refusing or failing to complete a test. Defendant refused to take a blood or urine test instead.

Lisa Smith, an LAPD criminalist, testified regarding the negative effects of alcohol on the body, and the mental and physical signs of impairment. She testified that for the purpose of driving, impairment can begin with a blood-alcohol level as low as .05, and at .08 everyone is impaired. Smith estimated that a man of defendant's height and weight who measured .07 approximately two hours after driving had an estimated blood alcohol level of .08, or perhaps as high as .12, at the time of driving. Based on a hypothetical describing defendant's physique, his actions while driving and during the FST's, and all of the available circumstances, Smith was of the opinion that the information collectively was consistent with someone who was under the influence of alcohol and impaired for the purposes of safely driving a motor vehicle.

### March 31, 2011 Incident (Counts 4-5)

On March 31, 2011, at approximately 10:30 p.m., Officer Phil Rodriguez was on patrol near the intersection of Victoria Avenue and 30th Street in Los Angeles. Officer Rodriguez received information about possible criminal activity with respect to a late 1990's gold Cadillac, and he was given a partial license plate number. Officer Rodriguez and his partner saw the vehicle stopped on the street and attempted to conduct an investigation. The officers got out of the patrol car, and Officer Rodriguez ordered the

---

[2] A criminalist testified that the machine's documentation showed the person blew into the instrument 13 times and only one of the breath volumes was acceptable.

4

driver, identified as defendant, to turn off the engine. Defendant "revved" his vehicle and fled at a high rate of speed. The officers got back in the patrol car and tried to catch up with defendant's car.

As he fled through the residential area, defendant committed numerous traffic violations before turning right on Buckingham Street. As the vehicle turned, an object was thrown from the driver's side. Another object was thrown from the driver's side as defendant turned again. Defendant then abruptly pulled over onto the sidewalk. Assisting officers later found a baggie containing a green leafy substance resembling marijuana near Buckingham Street and 28th Street. Officer Rodriguez's partner found a baggie near Buckingham Street and 30th Street containing 13 individually wrapped pieces of what Officer Rodriguez believed was cocaine base. Tests later confirmed that the packages contained marijuana and cocaine base.

A passenger in defendant's vehicle, a Mr. Samuels, was taken into custody and later released at the scene. After recovering the second baggie of drugs, Officer Rodriguez searched defendant's car. A box of empty baggies was found inside. When searching defendant's person, officers found $25 in one dollar bills and a cell phone. Officer Rodriguez saw a text message to defendant in reference to buying a $40 piece of narcotics. The message said, "Please come before it's time for me to leave," and "Lady's back for another 40 p." Officer Rodriguez was of the opinion that defendant possessed the narcotics for sale because of the amount, the packaging, the absence of paraphernalia, the cell phone order, defendant's tactics while driving, and the area of the pursuit, which was a "problem narcotics location."

The cell phone eventually went to the property division and was later destroyed. Officer Rodriguez testified that he was told the case was adjudicated, or perhaps not filed, and the narcotics property officer was given clearance to release it to the defendant. Since defendant did not pick it up, it was destroyed several months later.

During Officer Rodriguez's testimony, the trial court took judicial notice of the fact that defendant had posted bail on March 26, 2011, with respect to the March 25, 2011 incident.

**Defense Evidence**

Defendant testified that when he was arrested on March 31, 2011, a man named Ray was in his car with him. He had met Ray on Virginia Road and 30th Street about five minutes earlier. Ray was a dealer, and defendant had telephoned Ray earlier about purchasing cocaine from him. Defendant waited for Ray in his girlfriend's car, and Ray drove up and parked his BMW behind him. Ray got in defendant's car, and defendant attempted to make his purchase. When the police showed up, defendant panicked and took off. Ray threw something out of the car at Buckingham and 30th Street. Ray was in the passenger seat, and he "flicked" the item right past defendant and out the driver's side window. Defendant did not know what the object was, but he believed it had to be some type of drugs.

Defendant threw the marijuana out of the car on 28th Street. Defendant admitted he ran several stop signs while trying to evade the police. Defendant did not know where the cell phone with the text message came from, and the sandwich bags found inside his car were for sandwiches. He had a cell phone that night, but he got it back when he posted bail and was released after four hours. The text messages were not on his cell phone. Defendant said he still had the cell phone he recovered from the police station.

Upon cross-examination, defendant admitted having suffered felony convictions in 2003, 2007, and 2009. He said he understood that going through a stop sign is dangerous. When asked if he understood he could hurt someone, he replied that he was not going that fast. He eventually admitted he could hurt someone.

Thomas Maeweather, a former LAPD officer who is a licensed investigator, testified that a police officer who found out about an error in his police report would submit a follow-up report.[3] Maeweather testified that 30 minutes at the scene of a traffic stop might not be enough time to resolve the issue of whether one of the car's occupants should be released.

---

**3**     Officer Rodriguez testified on cross-examination regarding an error in his police report and another on the face sheet. Officer Miller testified on cross-examination regarding an error in the face sheet of his report.

**Prosecution Rebuttal**

On March 31, 2011, Officer Ruben Chavez was assisting in the investigation of defendant's evading and possession for sale arrest. He searched defendant and found a cell phone and currency on his person. Officer Chavez looked at the phone and saw a text message stating something about a lady waiting and looking to buy a 40 p, which is street vernacular for "a 40 piece of rock cocaine." Officer Chavez knew of no other phones found on defendant, in the car, or on the passenger. Officer Chavez showed the messages to Officer Rodriguez and then returned the cell phone to defendant's pocket.

Officer Chavez saw that the passenger appeared to be a transient. His clothes were torn and dirty, and he had a strong body odor. The passenger had no drugs or cell phones. After officers spoke with him and searched him and the car, he was released.

## DISCUSSION

### I. Absence of Lesser Included Offense Instruction

#### A. *Defendant's Argument*

Defendant contends the trial court erred by failing to instruct sua sponte on the lesser included offense of felony evasion of a peace officer, i.e., misdemeanor evasion of a peace officer under section 2800.1.

#### B. *Proceedings Below*

Defendant was charged with felony evasion of a peace officer in relation to both of the incidents described *ante*. The trial court instructed the jury with CALCRIM No. 2181, which defines the crime of felony evading a peace officer.[4]

---

[4] CALCRIM No. 2181 was read as follows: "The defendant is charged in counts 2 and 5 with evading peace officers with a wanton disregard for safety in violation of Vehicle Code section 2800.2. To prove the defendant is guilty of this crime, the People must prove that: one, a peace officer driving a motor vehicle was pursuing the defendant; two, the defendant who was also driving a motor vehicle, willfully fled from or tried to elude the peace officer, intending to evade the officer; three, during the pursuit, the defendant drove with willful or wanton disregard for the safety of persons or property; four, all of the following are true: (a), there was at least one lighted red lamp visible from the front of the peace officer's vehicle; (b) the defendant either saw or reasonably should have seen the lamp; (c) The peace officer's vehicle was sounding a siren as reasonably

7

### C. Relevant Authority

The trial court has a duty to instruct sua sponte on general principles of law that are relevant to the issues raised by the evidence. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085; *People v. Ervin* (2000) 22 Cal.4th 48, 90.) The determination of whether the trial court has a duty to give a particular jury instruction sua sponte is reviewed de novo. (*People v. Licas* (2007) 41 Cal.4th 362, 366 (*Licas*).)

A trial court must instruct the jury sua sponte on a lesser included offense only if there is substantial evidence of the lesser offense. (*Licas*, *supra*, 41 Cal.4th at p. 366.) "''"Substantial evidence" in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater, was committed. [Citations.]'" (*People v. Moye* (2009) 47 Cal.4th 537, 553; *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).) It is not simply "'""the existence of '*any* evidence, no matter how weak' [that will] justify instructions on a lesser included offense."'"" (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 477.) The court must instruct on a lesser included offense "'""'when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]'"'"" (*People v. Banks* (2014) 59 Cal.4th 1113, 1159.)

---

necessary; (d) The peace officer's vehicle was . . . distinctively marked; and, (e) the peace officer was wearing a distinctive uniform. A person employed as a police officer by the Los Angeles Police De[partment] is a peace officer. Someone commits an act when he does it willfully or on purpose. It is not required that he intend to break the law, hurt someone else, or gain any advantage. A person acts with wanton disregard for safety when he is aware that his actions present a substantial and unjustifiable risk of harm; two, . . . that he intentionally ignores that risk. The person does not, however, have to intend to cause damage. A vehicle is distinctively marked if it has features that are reasonably noticeable to other drivers, including a red lamp, siren, and at least one other feature that makes it look different from other vehicles that are not used for law enforcement purposes. A distinctive uniform means clothing adopted by a law enforcement agency to identify or distinguish members of its force. The uniform does not have to be complete or of any particular level of formality. However, a badge without more, is not enough."

### D.  No Sua Sponte Duty

Section 2800.1 provides in pertinent part that "[a]ny person who, while operating a motor vehicle and with the intent to evade, willfully flees or otherwise attempts to elude a pursuing peace officer's motor vehicle is guilty of a misdemeanor . . . ."  Section 2800.2 is violated when "a person flees or attempts to elude a pursuing peace officer in violation of Section 2800.1 and the pursued vehicle is driven in a willful or wanton disregard for the safety of persons or property, . . ."  Thus, section 2800.1 is clearly a lesser included offense of section 2800.2.  (*People v. Pendleton* (1979) 25 Cal.3d 371, 382 [a lesser included offense is one that is necessarily committed when another, greater offense is committed].)

Defendant contends there was no competent and admissible evidence as to the location or proximity of any people or property when he fled from the police on March 25, 2011, or even that there were people around.  He points out that when he ran the red light, the cars at the intersection were already stopped at the light, and there was no mention of any near misses or crashes.  He adds that the pursuit lasted less than 10 minutes, and Officer Miller admitted on cross-examination that defendant was not detained for felony evading but rather for misdemeanor evading.

As for the March 31, 2011 incident, defendant testified that he was not "going that fast."  He said he slowed down for the turns at the stop signs and looked before turning, which was corroborated by Officer Rodriguez.  There was no mention of any people or vehicles on the road during the pursuit.  If the jury believed defendant's testimony, they could reasonably have concluded defendant did not drive in a willful or wanton disregard for the safety of other persons and property had they been given the misdemeanor instruction.

We disagree with defendant and conclude there was no evidence showing that the lesser, but not the greater offense was committed.  In the first incident, defendant was driving in the dark without lights.  He drove through a stop sign without slowing down at an intersection where cross traffic had no stop sign.  Officer Miller noticed that the car was weaving, and defendant was having difficulty staying in his lane.  Defendant then

9

went through two more stop signs in succession.  When the officers turned on their lights and sirens, defendant not only did not stop, he accelerated—even though he was driving through a residential area.  On a major street, Washington Boulevard, he swerved around cars stopped at a red light and entered the oncoming traffic lane to go around the cars and run through the red light.  He continued fleeing police by failing to stop for another stop sign.  Defendant finally stopped his car when he was pursued by two patrol cars and a helicopter on Venice Boulevard, another major road.  Officer Miller testified that there was traffic on Washington Boulevard and there were other people on the streets.  We believe that driving without lights, running through four stop signs and a red light after accelerating in both a residential area and a busy thoroughfare paints a clear picture of willful and wanton disregard for safety.

In the second incident, defendant "revved" his engine and fled at a high rate of speed.  It was nighttime, and Officer Rodriguez testified that defendant was going at twice the speed limit of the residential neighborhood.  Defendant passed "several" stop signs without stopping before turning, at which time he ignored another stop sign.  He ignored yet another stop sign when he turned again.  Only after both parcels of narcotics had been thrown out the window did defendant stop his "reckless" driving and pull over.

Apart from the obvious dangers of speeding through streets at night while ignoring traffic signs and signals, under section 2800.2, subdivision (b), as pertinent here, "willful and wanton disregard" is found where a defendant drives while fleeing pursuing officers and during that time commits three or more violations that are assigned a traffic violation point count under section 12810.  Subdivision (f) of section 12810 provides in pertinent part that any "traffic conviction involving the safe operation of a motor vehicle" is subject to one violation point.  Given the number of traffic violations committed by defendant in both incidents, his conduct while driving is properly characterized as demonstrating willful and wanton disregard for the safety of other persons and property under the statute.  Defendant even admitted during cross-examination that he understood that going through a stop sign is dangerous and that he could hurt someone.

10

Accordingly, the trial court was not obliged to sua sponte instruct on misdemeanor evading. There was no question as to whether all of the elements of the charged offense were present, and there was no evidence that the offense was less than that charged. (*People v. Lopez* (1998) 19 Cal.4th 282, 288.)

Moreover, even if the trial court were found to have erred in not giving an instruction on the lesser included offense, the error would have been harmless under the test of *People v. Watson* (1956) 46 Cal.2d 818, 836). The California Supreme Court has stated that "to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility." (*Breverman*, *supra*, 19 Cal.4th at p. 165.) Because the evidence that defendant drove with a willful and wanton disregard for the safety of others was overwhelming, a more favorable result would not have been reasonably probable with an instruction on misdemeanor evading. (*People v. Watson*, at p. 836.)

## II. Denial of New Trial Motion

### A. Defendant's Argument

Defendant contends the cell phone that was booked into evidence and destroyed, and which contained incriminating text messages, belonged to Samuels. Thus, there was new evidence of a second cell phone. Defendant's conviction for possession for sales rested primarily on the text messages on the cell phone inspected at the scene, and given the evidentiary value of this new information, denial of his motion for new trial was an abuse of discretion.

### B. Proceedings Below

During the defense cross-examination of Officer Rodriguez, the following exchange occurred:

"[COUNSEL]: The cell phone, did you personally find the cell phone?

"[OFFICER RODRIGUEZ]: No.

"[COUNSEL]: And was the cell phone booked in evidence?

"[OFFICER RODRIGUEZ]: Yes.

"[COUNSEL]: Is it here in court, to your knowledge?

11

"[OFFICER RODRIGUEZ]: If I can explain? Not here. It's not here in court. It went to property division; it's been destroyed.

"[COUNSEL]: So it was part of the evidence in this case, to your knowledge; right?

"[OFFICER RODRIGUEZ]: Yes.

"[COUNSEL]: And it was destroyed when? In March or April of 2011?"

There was a pause while Officer Rodriguez referred to the property report. He then testified:

"[OFFICER RODRIGUEZ]: The way it was explained to me, sir, is initially when the item was booked, the case was adjudicated, giving the property, narco—narcotics property officer clearance to release it to the defendant. When he did not recover . . . come to gather his belongings, it was destroyed several months later.

"[COUNSEL]: When you said 'adjudicated,' you mean the case was over?

"[OFFICER RODRIGUEZ]: It was . . . I don't know if it wasn't filed or if it was . . .it was . . . this case was refiled. I'm not sure. But that's the way it was explained to me today.

"[COUNSEL]: And the text message on that cell phone apparently went with the cell phone; is that right, sir?

"[OFFICER RODRIGUEZ]: Yes, sir."

Defendant subsequently testified that he did not know where the cell phone with the text message came from and that the phone he had that night was given back to him when he bailed out. The text message was not on his cell phone, and he did not "do" text messages. He testified that he still had the cell phone he recovered from the police station.

Officer Chavez testified on rebuttal that he found a cell phone in defendant's front right pants pocket when he searched defendant. He looked at the phone and saw the text messages about buying a 40p. He knew of no other phones found on defendant, in the car, or on the passenger. He put the phone back into defendant's pocket at the scene.

At the close of trial, defense counsel requested to reopen because defendant claimed Officer Chavez had "lied on him" regarding the cell phone Chavez claimed to

12

have found in defendant's pocket. The court denied the request because defendant had already testified the phone he had was not the one with the text messages.

At sentencing, defendant told the court he took his case to trial because he knew he could prove his innocence, but the prosecution destroyed the evidence that could prove it. It was the passenger's cell phone, and "they turn around and say I was lying on the stand." Defendant said that someone should have told the jurors "they destroyed the evidence." Defendant claimed the prosecution's rebuttal witness, Officer Chavez, perjured himself on the stand.

Defendant's counsel addressed the court and argued that defendant had made some good points, and his statement should be treated as an informal motion for a new trial. The trial court said it required a written motion, notice to the prosecution, and a hearing. After an off-the-record discussion, the trial court stated it agreed with defense counsel's statement that there were no grounds for a new trial. The trial court had reviewed all of the grounds in Penal Code section 1181 and found that none applied. There was no newly discovered evidence. The cell phone with the incriminating text messages was found in defendant's pocket. Defendant's claim that Samuels was the seller and defendant the buyer, and that Samuels arrived in a white BMW lacked credibility in the light of the testimony that Samuels was unkempt and appeared to be homeless. The court stated that, to the extent defendant had made an oral motion for new trial, it was denied.

### C. Relevant Authority

Penal Code section 1181, subdivision 8, authorizes a trial court to order a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." We review an order denying a new trial motion for abuse of discretion. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1251.) The Supreme Court has held: "'In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: "'1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result

13

probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.'"" [Citation.]" (*People v. Beeler* (1995) 9 Cal.4th 953, 1004 (*Beeler*).)

### D. No Abuse of Discretion

Defendant urges that evidence "came to light during trial which established not only that there were two cell phones as opposed to one involved in this case, but that either Officer Rodriguez or Officer Chavez had fabricated their story regarding the cell phone." According to defendant, there was no way to reconcile the conflict absent an investigation, and he was therefore denied his right to develop a defense. Despite defendant's characterization of his own and Officer Rodriguez's testimony, there was no newly discovered evidence at trial.

Although defendant claims the accounts by Officers Rodriguez and Chavez were at odds, we do not agree. Officer Chavez may have returned defendant's cell phone to him at the scene. Despite that possibility, it is also quite likely that the phone was taken from defendant at booking and placed in evidence. The evidence from defendant that he collected his phone after posting bail was controverted, since Officer Rodriguez testified that the phone was booked into evidence and was eventually handed over to the property department, where it remained until it was eventually destroyed. The jury was fully aware of the conflict in testimony and decided which version to believe. It was not "established," contrary to defendant's assertion, that there were two cell phones found at the scene, and in ruling upon a new trial motion, the trial court may consider the issue of credibility. (*People v. Delgado* (1993) 5 Cal.4th 312, 329.)

Moreover, the evidence of the cell phone was known to the defense before trial by means of the discovery requirements. The incriminating text messages were included in Officer Rodriguez's police report, which was provided to the defense and used to cross-examine the officer. As stated in Penal Code section 1181, subdivision (8), a new trial is proper when "new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." To the extent

14

that the conflict in testimony can be considered new evidence, it was clearly known by defendant before and during trial.  Indeed, any conflict was created by defendant's testimony at the end of trial.  Defendant's testimony was the only evidence he received a cell phone back from the police on bailing out and that he still possessed the cell phone.  He did not produce the phone at trial.  Facts "within the knowledge of the defendant at the time of trial are not newly discovered even though he did not make them known to his counsel until later," and they do not support a new trial motion.  (*People v. Greenwood* (1957) 47 Cal.2d 819, 822; see also *People v. Williams* (1962) 57 Cal.2d 263, 273.)

In sum, defendant offers no new evidence that would "render a different result probable on a retrial of the cause."  (*Beeler*, *supra*, 9 Cal.4th at p. 1004.)  All of the evidence was already presented at trial in the form of testimony by Officers Rodriguez and Chavez and defendant.  The only "new" information was that offered by defendant on the stand, after he heard the testimony of the officers.  He does not show what additional information any investigation could produce.  As the trial court pointed out, it was unlikely a new jury would find credible defendant's assertion that the alleged second cell phone, which showed that it had been used by a drug seller rather than a user, belonged to the transient who was a passenger defendant's car.

Finally, contrary to defendant's assertion, his conviction for possession for sales did not rest primarily on the text message.  In addition to the text messages, Officer Rodriguez cited myriad reasons for his opinion:  the quantity of the narcotics, the lack of paraphernalia, the location of the arrest (in a "problem narcotics location"), the packaging, and the evasive driving tactics, i.e., the attempt to flee and get rid of the evidence.

The trial court did not abuse its discretion in denying defendant's oral motion for a new trial.

## III. Destruction of Cell Phone

### A. Defendant's Argument

Defendant contends that law enforcement violated his due process rights under *Youngblood* and *Trombetta*[5] by destroying the cell phone that was purportedly found on defendant and that contained incriminating text messages. Defendant maintains the cell phone was not his, but rather that of Samuels. He maintains his conviction must be reversed without any consideration of prejudice.

### B. Relevant Authority

Under the *Trombetta/Youngblood* line of cases, the prosecution and law enforcement must preserve evidence "that might be expected to play a significant role in the [defendant's] defense." (*Trombetta*, *supra*, 467 U.S. at p. 488, fn. omitted.) To meet this standard, the evidence must "both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id*. at p. 489) To show a denial of federal constitutional due process from the destruction of such evidence, the defendant must also show that the police acted in bad faith. (*Youngblood*, *supra*, 488 U.S. at p. 58.)

"The presence or absence of bad faith by the police for purposes of the Due Process Clause . . . necessarily turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (*Youngblood*, *supra*, 488 U.S. at pp. 56-57, fn.*; *Beeler*, *supra*, 9 Cal.4th at p. 1000.) A due process violation occurs when the state is aware that the evidence could form a basis for exonerating the defendant and fails to preserve it as part of a conscious effort to circumvent its constitutional discovery obligation. (*Trombetta*, *supra*, 467 U.S. at p. 488; *Beeler*, at p. 1000; *People v. Zapien* (1993) 4 Cal.4th 929, 964.)

---

[5] *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*); *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*).

### C. *No Due Process Violation*

Defendant mentioned the destruction of his cell phone only in the context of making an informal new trial motion. This is not the equivalent of objecting on the basis of a due process violation resulting from law enforcement's bad faith failure to preserve potentially useful evidence. Therefore, defendant has forfeited this issue due to a failure to argue the *Trombetta/Youngblood* issue below—which would have given the People the opportunity to argue the *Trombetta* issue and the trial court the opportunity to rule on the issue of bad faith. (*People v. Homick* (2012) 55 Cal.4th 816, 856, fn. 25; *People v. Simon* (2001) 25 Cal.4th 1082, 1103.) In any event, we conclude defendant's argument is without merit.

According to defendant, the missing cell phone constituted exculpatory evidence because it would have shown by its very existence that it was not defendant's cell phone, thereby allowing the phone to be tested and/or accessed. This would have shown that it was *that* phone that contained the incriminating text messages, as opposed to his own cell phone, which was released to him. The evidence would also have shown ownership and identity. Moreover, the evidence would have established the bad faith of Officers Rodriguez and Chavez, since one of their stories would have been shown to be a fabrication. The destruction of the cell phone also prevented defendant from effectively cross-examining Officers Rodriguez and Chavez and the property officer in violation of *Davis v. Alaska* (1974) 415 U.S. 308 [defense must be allowed to effectively cross-examine witnesses on existence of possible bias and prejudice].)

Throughout this argument, defendant presumes that it has been established that his own story about picking up the cell phone upon release was not a fabrication. This was a decision to be made by the jury, which heard all three accounts. Defendant has not shown that the cell phone with the text messages was not his by his mere assertion that there were two cell phones. As a result, there is no basis for assuming there were two cell phones found at the scene of the traffic stop. Both Officer Rodriguez and Officer Chavez testified that only one cell phone—the one in defendant's pocket—was found at the stop, and no phone was found either in the car or on the passenger who appeared to be a

17

homeless person. Therefore, defendant's logical conclusion is actually bereft of logic, since it is based on a faulty premise. The mere possibility that an item may have helped the defense is insufficient to establish materiality. (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1055.) Also, contrary to defendant's complaint, the jury was fully aware that the cell phone had been destroyed.

Although Officer Rodriguez responded "Yes" when asked if the cell phone was booked into evidence, he then stated the cell phone "went to [the] property division." It was the property division that destroyed the cell phone. There is nothing in the record to suggest that the normal practice of taking an arrestee's property from him at booking did not occur, or that Officer Rodriguez did not then take defendant's cell phone and book it into evidence, and that the phone was later released to the property division to be picked up by the owner due to the case being not filed, or due to an error.

Furthermore, defendant has failed to make a showing of bad faith on the part of law enforcement. Negligent destruction of (or failure to preserve) potentially exculpatory evidence, without evidence of bad faith, will not give rise to a due process violation. (*Youngblood*, *supra*, 488 U.S. at p. 58.) There was no evidence to suggest that Officer Rodriguez's account of what happened to the cell phone was false. There was no evidence that any officer connected to defendant's detention or arrest was involved in the destruction of the cell phone in a conscious effort to avoid discovery obligations. Since no bad faith was shown, and since negligence is an insufficient basis on which to base sanctions under *Trombetta/Youngblood*, defendant's claim is without merit. (See *People v. Webb* (1993) 6 Cal.4th 494, 519-520.)

## IV.  Penal Code Section 654

### A.  *Defendant's Argument*

Defendant contends the trial court improperly imposed separate punishments for his convictions for driving under the influence of alcohol (§ 23152, subd. (a)), evading an officer with willful disregard (§ 2800.2, subd. (b)), and driving with a suspended license (§ 14601.2, subd. (a)) in counts 1, 2, and 3 respectively. All of these incidents occurred

on March 25, 2011.[6]  According to defendant, the record lacks sufficient evidence to support the court's implied finding that defendant's act of driving under the influence was divisible from his acts of evading and driving with a suspended license.

### B.  Relevant Authority

Penal Code section 654, subdivision (a) provides in pertinent part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  A defendant thus may not be punished for two separate crimes which arise either out of a single act or out of an indivisible transaction.  When Penal Code section 654 applies, the proper procedure is to stay imposition of sentence on one of the crimes, with the stay to become permanent on completion of the term imposed on the other. (*People v. Pearson* (1986) 42 Cal.3d 351, 360.)

### C.  One Violation of Penal Code Section 654

We believe defendant should not have been punished for both driving while under the influence (count 1) and driving with a suspended license (count 3) under the more recent test set forth in *People v. Jones* (2012) 54 Cal.4th 350 (*Jones*).  We do not believe, however, that defendant's conviction for evading a peace officer was an indivisible part of the act of driving under the influence and with a suspended license

*Jones* relied on Penal Code "section 654's plain language" in order to hold that application of the statute requires a determination as to whether a defendant's crimes are based on a single physical act that violates different provisions of law.  (*Jones*, *supra*, 54 Cal.4th at pp. 352, 358, 360.)  Although we would reach the same result under the decades-old test of *Neal v. State of California* (1960) 55 Cal.2d 11, 19, which required an analysis of the defendant's intent and objective in each count, the *Jones* court majority indicated that a court should not be forced to "divine what objective or objectives the defendant might have."  (*Jones*, at p. 360.)  *Jones* concluded it was better to rely on Penal

---

**6**    Defendant mistakenly states that these three counts relate to the March 31, 2011 incident, which encompasses counts 4 and 5.

19

Code section 654's actual language in resolving a "single-act" case. (*Jones,* at p. 360.) In arriving at its conclusion, the *Jones* court expressly overruled *In re Hayes* (1969) 70 Cal.2d 604, which had held that multiple punishment for driving while intoxicated and with an invalid license was not prohibited, since there were two distinct criminal acts that shared the neutral noncriminal act of driving. (*Jones*, at pp. 355, 358, 360; *Hayes*, at p. 611.)

Turning first to the divisibility of the evading count as a separate physical act, we note that a violation of section 2800.2, subdivision (a) is a specific intent offense. As charged in count 2, it requires the intent to "evade, flee and otherwise attempt to elude a pursuing peace officer's motor vehicle." Defendant could have stopped his car when the police notified him by means of their lights and siren that they wished him to do so. Instead, he accelerated and fled, which we believe constitutes a separate physical act from merely driving a car while under the influence or without a license. The *Jones* court, after propounding its rule, "recognize[d] that what is a single physical act might not always be easy to ascertain. In some situations, physical acts might be simultaneous yet separate for purposes of section 654." (*Jones*, *supra*, 54 Cal.4th at p. 358.) We believe this is just such a situation.

Finally, we note that, if multiple punishment for evading and for driving under the influence and/or with a suspended license were prohibited in this situation, there would be no incentive for a person driving under the influence or with a suspended license to stop when an officer indicates that the driver is to pull over (apart from a desire not to further break the law), since the driver would suffer no greater punishment by trying to escape. (See *People v. Butler* (1986) 184 Cal.App.3d 469, 474.)

The convictions for driving under the influence and with a suspended license, however, constitute a single physical act that violates different provisions of law. It is akin to the situation in *Jones*, where the defendant was found to have been erroneously sentenced to three concurrent terms for his convictions based on having a loaded revolver in his car. Jones was convicted of possession of a firearm by a felon, carrying a readily accessible concealed and unregistered firearm, and carrying an unregistered loaded

20

firearm in public. (*Jones*, *supra*, 54 Cal.4th at p. 352.) The *Jones* court concluded that Penal Code section 654 prohibited punishment for more than one of those crimes because Jones's carrying, and thus possessing, a single firearm was a single physical act. (*Jones*, at pp. 352, 353, 360.) The court noted that, although it might make sense to punish more severely the act of firearm possession when it violates multiple penal provisions instead of only one, it was up to the Legislature to change the law to allow for multiple punishment in such situations.

Accordingly, relying on the "plain language" of Penal Code section 654 as interpreted by *Jones*, we conclude that defendant's sentence in count 3 must be stayed: Counts 1 and 3 are based on the single physical act of driving a car that, under the circumstance of this case, violated more than one criminal statute.

## V. Custody Credits

### A. Defendant's Argument

In his reply brief, defendant argues for the first time that he was "shorted" 12 days of custody credits at the time of sentencing. According to defendant, he was arrested on March 25, 2011, and he posted bail on March 28, 2011, which entitled him to four days of credits. He was arrested again on March 31, 2011, and released on bond on April 1, 2011, which totaled two more days in custody, for a total of six days. With six days of good time/work time, defendant was entitled to 12 days of custody credits that the trial court did not consider. Defendant contends the trial court found a total of 422 actual plus 442 good time/work time credits for a total of 884 custody credits[7] when it should have been 448 actual plus 448 good time/work time credits for a total of 896 days.

### B. Proceedings Below

At defendant's November 26, 2013 sentencing, when the trial court asked the defense for its credits calculation, defendant responded that he had been in custody since March 31, 2011. This conflicts with his current assertion that he posted bond on April 1, 2011, noted *ante*. It also conflicts with his trial testimony that he posted bail for the

---

[7] Defendant's math is incorrect unless he means 442 actual days and 442 good time/work time credits.

March 31, 2011 incident the same night he was arrested.  His assertion that he posted bail on March 28, 2011, for the March 25, 2011 incident is contradicted by the trial court having taken judicial notice that defendant posted bail on March 26, 2011.

According to the reporter's transcript, the trial court granted 972 actual days and 972 good time/work time days for a total of 1,944 days total credits.  This calculation corresponds to a finding that defendant had indeed been held in custody since March 31, 2011.  This quantity of credits is at odds with defendant's current claim that he was awarded only 896 days of total credits.  Unfortunately, the clerk's transcript does not contain a copy of defendant's abstract of judgment.  Therefore, this court has no way of knowing the quantity of credit days defendant was actually awarded.  Appellate counsel should address the matter to the trial court if he believes defendant is entitled to additional custody credits.

## DISPOSITION

The judgment is modified to stay defendant's sentence on count 3 pursuant to Penal Code section 654.  In all other respects the judgment is affirmed.  The superior court is directed to amend defendant's abstract of judgment regarding the stay of sentence in count 3 and forward a copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

22